# NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/walpc/

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 0 6 2016
for CHIEF JUSTICE

This opinion was filed for record
at 8:00am on Oct 6, 2016

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WHATCOM COUNTY, a municipal corporation, | ) ) ) | No. 91475-3 |
| Respondent, | ) ) ) | En Banc |
| ERIC HIRST, LAURA LEIGH BRAKKE; WENDY HARRIS; DAVID STALHEIM; and FUTUREWISE, | ) ) ) ) ) | Filed OCT 0 6 2016 |
| Petitioners, | ) ) | |
| WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, | ) ) ) | |
| Defendant. | ) ) ) | |

WIGGINS, J.—We granted review of this challenge to the Western Washington Growth Management Hearings Board's (Board) decision on the validity of Whatcom County's (County) comprehensive plan and zoning code under the Growth Management Act (GMA or Act), chapter 36.70A RCW. The County argues that the Board's conclusions are based on an erroneous interpretation of the law and asks us to hold that the County's comprehensive plan protects the quality and availability of water as required by the GMA.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We reject the County's arguments. The GMA requires counties to ensure an adequate water supply before granting a building permit or subdivision application. The County merely follows the Department of Ecology's "Nooksack Rule";[1] it assumes there is an adequate supply to provide water for a permit-exempt well unless Ecology has expressly closed that area to permit-exempt appropriations. This results in the County's granting building permits for houses and subdivisions to be supplied by a permit-exempt well even if the cumulative effect of exempt wells in a watershed reduces the flow in a water course below the minimum instream flow. We therefore hold that the County's comprehensive plan does not satisfy the GMA requirement to protect water availability and that its remaining arguments are unavailing. We reverse the Court of Appeals in part and remand to the Board for further proceedings.

FACTS

I.   Factual History

This case is the latest step in a series of disputes concerning the County's land use regulations. The history is only summarized here; a detailed history of the disputes is contained in our 2009 opinion, *Gold Star Resorts, Inc. v. Futurewise*, 167 Wn.2d 723, 726-33, 222 P.3d 791 (2009). In *Gold Star Resorts*, we considered several challenges under the GMA to the County's comprehensive plan—specifically, challenges to provisions regarding limited areas of more intensive rural development and rural densities. We agreed with the Board and directed the County to revise its comprehensive plan in order to conform to the 1997 amendments to the GMA. *Id.* at 740.

---

[1] The Nooksack Water Resource Inventory Area, chapter 173-501 WAC.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In response to our ruling in *Gold Star Resorts* and a series of subsequent board rulings requiring the County to bring its comprehensive plan into compliance with the GMA, the County amended its comprehensive plan and zoning code by adopting Ordinance No. 2012-032. Ordinance No. 2012-032 was an effort to comply with the GMA's requirement that the County's rural element include measures to protect surface and groundwater resources. To accomplish this objective, the ordinance amended the County's Comprehensive Plan Policies 2DD-2.C and -2.D, and adopted by reference numerous preexisting county regulations. These policies, and the regulations they incorporate, were intended to address the GMA requirements to protect both water availability and water quality.

Regarding water availability, the County's development regulations adopt Ecology's regulations—the regulations allow a subdivision or building permit applicant to rely on a private well only when the well site "proposed by the applicant does not fall within the boundaries of an area where [Ecology] has determined by rule that water for development does not exist." Whatcom County Code (WCC) 24.11.090(B)(3), .160(D)(3), .170(E)(3).[2]

---

[2] Though not related directly to this appeal, the County also took steps to address our decisions in *Department of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 43 P.3d 4 (2002) and *Kittitas County v. Eastern Washington Growth Management Hearings Board*, 172 Wn.2d 144, 256 P.3d 1193 (2011). Specifically, WCC 21.01.040 requires contiguous parcels of land with the same ownership to be considered as one parcel for the purpose of permit-exempt water appropriations. The County also adopted policies incorporating regulations and programs to protect water quality. These measures include critical area regulations, a storm water management program, sewage regulations, and measures designed to protect the Lake Whatcom watershed. The Board ruled that the measures designed to protect the Lake Whatcom watershed comply with the GMA and these measures are unrelated to this appeal. *See Futurewise v. Whatcom County*, Nos. 05-2-0013 and 11-2-0010c (W. Wash. Growth Mgmt. Hr'gs Bd. Jan. 23, 2014).

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

II.     Procedural History

Eric Hirst, Laura Leigh Brakke, Wendy Harris, David Stalheim, and Futurewise (collectively Hirst) filed a petition for review with the Board, challenging Ordinance No. 2012-032. Relevant to this appeal, Hirst challenged the adequacy of the County's measures to protect surface and groundwater resources (Policies 2DD.-2.C.1 through .9) and sought a declaration of invalidity.[3]

*A. Board's discussion of applicable law*

The Board held a hearing and issued a final decision and order (FDO). The Board began its decision by citing to the "Applicable Law" as provided by the GMA. As the Board observed, the GMA imposes several requirements on a local government's planning. Relevant here, the GMA requires counties to consider and address water resource issues in land use planning. *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 178, 256 P.3d 1193 (2011) (counties must regulate to ensure land use is not inconsistent with available water resources). Accordingly, a county's comprehensive plan must "provide for protection of the quality and quantity of groundwater used for public water supplies.'" FDO at 13 (emphasis omitted) (quoting RCW 36.70A.070(1)). The GMA also requires counties to plan for a rural element that "'include[s] measures that . . . protect . . . surface water and groundwater resources.'" *Id.* at 14 (emphasis omitted) (quoting RCW 36.70A.070(5)(c)(iv)).

---

[3] Hirst also asserted, unsuccessfully, that the County's transportation element was inconsistent with its rural element in violation of RCW 36.70A.070 or RCW 36.70A.130; this issue is not before us on appeal.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The Board also noted that counties must include a rural element in their comprehensive plan that includes "'lands that are not designated for urban growth, agriculture, forest, or mineral resources.'" *Id.* at 13 (quoting RCW 36.70A.070(5)). The County's comprehensive plan must ensure that this rural element maintains its "''[r]ural character''" by planning its land use and development in a manner that is "'compatible with the use of the land by wildlife and for fish and wildlife habitat'" and "'[t]hat are consistent with the protection of natural surface water flows and groundwater and surface water recharge and discharge areas.'" *Id.* (emphasis omitted) (quoting RCW 36.70A.030(15)(d), (g)).

In addition to these planning requirements, the Board noted that the GMA provides 13 goals to guide the development of a county's comprehensive plan. These include a goal to "'[p]rotect the environment and enhance the state's high quality of life, including air and water quality, and the availability of water.'" *Id.* (emphasis omitted) (quoting RCW 36.70A.020(10)). These goals "are not listed in order of priority and shall be used exclusively for the purpose of guiding the development of comprehensive plans and development regulations." RCW 36.70A.020. Read collectively, these goals convey some conceptual guidance for growth management. Richard J. Settle, *Washington's Growth Management Revolution Goes to Court*, 23 SEATTLE U. L. REV. 5, 8 (1999).

The Board interpreted these planning requirements and goals to indicate that

> patterns of land use and development in rural areas must be consistent
> with protection of instream flows, groundwater recharge, and fish and
> wildlife habitat. A County's Comprehensive Plan rural lands provision

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

must include measures governing rural development to protect water resources.

FDO at 21.

The GMA does not define the requirements to plan for the protection of water resources found in RCW 36.70A.070. The Act also fails to define how the requirements are to be met. Thus, Hirst argued that the County's comprehensive plan must itself protect the availability of water resources, placing the burden on local governments to protect the availability of water, RCW 36.70A.020(10), protect groundwater resources, RCW 36.70A.070(5)(c)(iv), and ensure an adequate water supply when it approves a building permit, RCW 19.27.097(1) and RCW 58.17.110. The County countered that it complied with the GMA by drafting a comprehensive plan that incorporates and is consistent with Ecology's regulations in water resource inventory area (WRIA) 1.[4] In evaluating this relationship between Ecology's responsibility to protect water pursuant to the Water Resources Act of 1971 (WRA), chapter 90.54 RCW, and the responsibility of local governments to protect water availability and quality pursuant to the GMA, the Board stated that "it is the local government—and not Ecology—that is responsible to make the decision on water adequacy as part of its land use decision, and in particular, with respect to exempt wells." FDO at 23.

---

[4] WRIAs establish instream flows affecting the approval of water rights permits and appropriations for most of the state; WRIA 1 is in effect in the County. *See* ch. 173-501 WAC (the Nooksack Rule). There are now 62 WRIAs designated, described, and subject to the rules promulgated by Ecology. *See generally* chs. 173-501 to -564 WAC. Though specific rules apply to each of these WRIAs, they generally share the purpose of retaining "perennial rivers, streams, and lakes in [the WRIAs] with instream flows and levels necessary to provide for preservation of wildlife, fish, scenic, aesthetic, and other environmental values, and navigational values, as well as recreation and water quality." WAC 173-501-020.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

*B. Board's findings and conclusions on water quality and availability*

Hirst presented considerable evidence and the Board found substantial evidence of limits on water availability in rural Whatcom County. *See id.* at 23-28. These water availability limitations were reflected in findings that a large portion of the County is in year-round or seasonally closed watersheds and that most of the water in the Nooksack watershed was already legally appropriated. *Id.* at 23-34. The Board also found that average minimum instream flows in portions of the Nooksack River "are not met an average of 100 days a year." *Id.* at 24. Despite the limited water availability, 1,652 permit-exempt well applications have been drilled in otherwise closed basins since 1997 and an additional 637 applications were pending in March 2011. *Id.* Further, the Board noted that the County recognized as early as 1999 that this proliferation of rural, permit-exempt wells was creating "'difficulties for effective water resource management.'" *Id.* (quoting Ex. C-671-D at 49 (1999 *Whatcom County Water Resource Plan*)).

The Board concluded that the County failed to comply with the GMA, specifically with the requirement to protect surface water and groundwater resources pursuant to RCW 36.70A.070(5)(c). The Board's conclusion that the comprehensive plan does not protect water availability is predicated on the Board's finding that

> the water supply provisions referenced [by the amended policies] do not require the County to make a determination of the legal availability of groundwater in a basin where instream flows are not being met.

FDO at 40. Implicit in this conclusion is the Board's determination that water is not presumptively available for permit-exempt withdrawals in WRIA 1. However, despite concluding that the comprehensive plan does not protect water availability or water

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

quality, the Board denied Hirst's request for a declaration of invalidity and instead remanded the ordinance to the County to take corrective action.

Both parties appealed separately. The County's appeal, focusing exclusively on its measures to protect ground and surface water resources, challenged the Board's determination of noncompliance with the GMA. Hirst challenged the Board's decision not to declare the ordinance invalid. The cases were consolidated in Skagit County Superior Court, and the Board issued its certificate of appealability of the FDO, certifying the consolidated appeals for direct review to the Court of Appeals. Following the County's appeal of a second order of compliance issued by the Board in April 2014, the Court of Appeals granted review. Its review consolidated that appeal, the prior consolidated appeals for direct review, and the County's motion for discretionary review of the original FDO.

The Court of Appeals reversed the Board, holding that the Board erroneously interpreted and applied the law in holding that the ordinance failed to comply with the GMA. The Court of Appeals further held that the Board engaged in unlawful procedure by taking official notice of and relying on two documents without first providing the County notice and the opportunity to contest the documents. The Court of Appeals affirmed the Board's decision not to declare the ordinance invalid, holding that the decision was a proper exercise of the Board's discretion.[5]

_____

[5] As an initial matter, we reject Hirst's argument that the County's failure to assign error to the Board's findings of fact by number renders these findings verities on appeal. We affirm the Court of Appeals on this issue, noting that the Board did not specifically delineate findings of fact by number; instead, it produced a blend of factual findings and legal conclusions. *See* FDO at 23-44. As the Court of Appeals properly found, "the nature and extent of the County's challenges to [the findings of fact] are clear. Thus, this court's review is not in any way

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We granted review and now reverse the Court of Appeals in part.

ANALYSIS

The County argues that the Board's conclusions are based on an erroneous interpretation of the law. RCW 34.05.570(3)(d). Though there are several arguments raised in the County's appeal of the Board's decision, the appeal focuses on the subject of water availability. This principal issue concerns the actions local growth management planners and administrators must take to ensure water availability under the GMA.

Consistent with the Board's determination, Hirst asserts that the GMA requires local governments to determine water availability as part of its land use decision. They argue that the County's plan does not require the County to obtain evidence that water is legally available before issuing building permits or approving subdivisions that rely on permit-exempt appropriations. Thus, Hirst asserts that the comprehensive plan results in water withdrawals that impact minimum instream flows.

The County responds that its comprehensive plan protects the availability of water because it ensures that the County will approve a subdivision or building permit application that relies on a permit-exempt well for its water supply only when the proposed well "does not fall within the boundaries of an area where [Ecology] has determined by rule that water for development does not exist." WCC 24.11.090(B)(3),

---

hindered by the absence of formal assignment of error. *Whatcom County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 186 Wn. App. 32, 44, 344 P.3d 1256, *review granted*, 183 Wn.2d 1008, 352 P.3d 188 (2015). We may review administrative decisions in spite of technical violations when a proper assignment of error is lacking but the nature of the challenge is clear and the challenged finding is set forth in the party's brief. *Yakima County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 168 Wn. App. 680, 687 n.1, 279 P.3d 434 (2012). Both are present here, and we reach the merits of the County's challenges.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

.160(D)(3), .170(E)(3). In effect, the County's position is that water is presumptively available—i.e., that "not unavailable" is synonymous with "available."

In effect, the County delegates the decision on water availability to Ecology's Nooksack Rule, chapter 173-501 WAC. The Nooksack Rule establishes minimum instream flows for WRIA 1, covering most of the County. However, the County argues—and Ecology agrees—that the closures and minimum flow requirements established by the rule are not applicable to permit-exempt wells in the County. Thus, the County argues that its comprehensive plan complies with the GMA requirements because water is presumptively available in the County for permit-exempt wells. The County asserts that under the GMA, the proper inquiry is whether its comprehensive plan is consistent with Ecology's regulations designed to protect water and to ensure that water is legally available.

We reject these arguments in the context of the GMA challenge before us. The GMA places an independent responsibility to ensure water availability on counties, not on Ecology. To the extent that there is a conflict between the GMA and the Nooksack Rule, the later-enacted GMA controls.

Ecology adopted the Nooksack Rule in 1985, and the rule has not been amended. We have since recognized that "Ecology's understanding of hydraulic continuity has altered over time, as has its use of methods to determine hydraulic continuity and the effect of groundwater withdrawals on surface waters." *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 76, 11 P.3d 726 (2000). When Ecology adopted the minimum instream flow rules, such as those contained within the Nooksack Rule, it "did not believe that withdrawals from deep confined aquifers would

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

have any impact on stream flows." *Id.* at 88. However, we now recognize that groundwater withdrawals can have significant impacts on surface water flows, and Ecology must consider this effect when issuing permits for groundwater appropriation. *Id.* at 80-81.

We hold that the same standard applies to counties when issuing building permits and subdivision approvals. We have been protective of minimum instream flow rules and have rejected appropriations that interfere with senior instream flows. *E.g., Swinomish Indian Tribal Cmty. v. Dep't of Ecology*, 178 Wn.2d 571, 598, 311 P.3d 6 (2013); *Foster v. Dep't of Ecology*, 184 Wn.2d 465, 362 P.3d 959 (2015). Our jurisprudence and well-established principles of statutory interpretation lead us to affirm the Board's decision that the County's comprehensive plan does not satisfy the GMA requirement to protect water availability.

I.    Standard of Review

The Washington Administrative Procedure Act, chapter 34.05 RCW, governs judicial review of challenges to board actions. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 154 Wn.2d 224, 233, 110 P.3d 1132 (2005). Though county actions are presumed compliant, this deference "is neither unlimited nor does it approximate a rubber stamp." *Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 161 Wn.2d 415, 435 n.8, 166 P.3d 1198 (2007). Instead, deference to counties remains "bounded . . . by the goals and requirements of the GMA." *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 561, 14 P.3d 133 (2000). Further, we do not afford counties any deference when it comes to interpreting the GMA. *Kittitas County*, 172 Wn.2d at 156 (citing *Lewis County v. W.*

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

*Wash. Growth Mgmt. Hr'gs Bd.*, 157 Wn2d 488, 498, 139 P.3d 1096 (2006). On appeal to this court, the County retains the burden of establishing that the Board's decision is based on an erroneous interpretation of the law. *King County*, 142 Wn.2d at 553.

The Board must find compliance "unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(1), (3). To find an action clearly erroneous, the Board must be "'left with the firm and definite conviction that a mistake has been committed.'" *King County*, 142 Wn.2d at 552 (quoting *Dep't of Ecology v. Pub. Util. Dist. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993)). We review the Board's legal conclusions de novo, giving substantial weight to the Board's interpretation of the GMA. *Id.* at 553.

We review questions of statutory interpretation de novo. *Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015). Our fundamental purpose in statutory interpretation is to ascertain and discern the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The court discerns legislative intent from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 9-19. These rules of statutory interpretation also apply to administrative rules and regulations. *See Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 51-52, 239 P.3d 1095 (2010).

The dissent ignores these important rules of statutory interpretation, and focuses solely on a single statute in isolation from its relevant GMA statutory scheme.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

Dissent at 2-6 (discussing RCW 19.27.097). As a result, the dissent reaches a conclusion about the meaning of this statute that is at odds with our jurisprudence on statutory interpretation and with the GMA's larger structure, overarching goals, and requirements.

II.    The Board Correctly Ruled That the County's Rural Element Fails To Comply with the Requirement To Protect Water Availability

We reverse the Court of Appeals and hold that the Board properly interpreted and applied the law in concluding that the County's comprehensive plan fails to provide for the protection of water resources. The Board's decision properly placed the burden on the County to ensure the availability of water under the GMA pursuant to the legislative intent, relevant statutory schemes when read in context and as a whole, and this court's jurisprudence considering groundwater appropriations that impact minimum flows.

A. *Washington's history of water regulation*

We hold that the County's comprehensive plan does not protect water availability because it allows permit-exempt appropriations to impede minimum flows. In reaching this holding, we note that minimum flows are exactly that: flows or levels "to protect instream flows necessary for fish and other wildlife, recreation and aesthetic purposes, and water quality." *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 592. By statute, the only exception to these flows is found at RCW 90.54.020(3) and, though this case does not implicate this exception, we have been extremely protective of withdrawals pursuant to that statute. *See id.*; *Foster*, 184 Wn.2d 465. As scientific understanding of water resources has increased, so too have Washington's

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

restrictions on the availability of water. Washington's original water code, chapter 90.03 RCW, was enacted in 1917 and regulated only surface water appropriations. In 1945, the legislature passed the groundwater code to subject the withdrawal of groundwater to the permitting process then applicable to surface water rights in order to protect senior water rights and the public welfare. *See* RCW 90.44.020; RCW 90.03.290(3). Specified withdrawals were exempt from these permit requirements:

> [A]ny withdrawal . . . for single or group domestic uses in an amount not exceeding five thousand gallons a day . . . is and shall be exempt from the provisions of this section, but, to the extent that it is regularly used beneficially, shall be entitled to a right equal to that established by a permit issued under the provisions of this chapter.

RCW 90.44.050. These permit-exempt withdrawals are appropriations. *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 588. Recognizing that any withdrawal of water impacts the total availability of water, we have held that an appropriator's right to use water from a permit-exempt withdrawal is subject to senior water rights, including the minimum flows established by Ecology. *See Campbell & Gwinn*, 146 Wn.2d at 16; *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 598. These exemptions existed in part because the legislature's goal in 1945 was to encourage the development and settlement of rural family farms drawing between 200 and 1,500 gallons of water per day. *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 321-22, 268 P.3d 892 (2011) (Wiggins, J., dissenting) (citing Kara Dunn, *Got Water? Limiting Washington's Stockwatering Exemption to Five Thousand Gallons Per Day*, 83 WASH. L. REV. 249, 258 (2008)).

These legislative priorities continued to change as Washington's population increased and the limitations on its natural resources became more apparent. *See*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 592 ("Growing, competing demands for water led to a number of new laws over time, and among these are acts and statutes designed to further the goal of retaining sufficient water in streams and lakes to sustain fish and wildlife, provide recreational and navigational opportunities, preserve scenic and aesthetic values, and ensure water quality."). "In 1955, the legislature declared the policy of the State to be that sufficient water flow be maintained in streams to support fish populations and authorized rejection of water right applications if these flows would be impaired." *Id.* (citing LAWS OF 1955, ch. 12, § 75.20.050 (codified as amended at RCW 77.57.020)).

The legislature continued to enact measures to protect the flows necessary for fish, wildlife, and water quality with the minimum water flows and levels act of 1969, chapter 90.22 RCW. In part, this act authorized Ecology to "establish minimum water flows . . . for the purposes of protecting fish, game, birds, or other wildlife resources, or recreational or aesthetic values of said public waters whenever it appears to be in the public interest." RCW 90.22.010. Once established, minimum flows are like any other appropriative water right in that they are subject to the rule of "first in time is the first in right." *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 591.

The WRA was intended to ensure adequate water to "meet the needs of the state's growing population" while concurrently maintaining "instream resources and values." RCW 90.54.010(1)(a). To balance growth and stream maintenance, the WRA directed Ecology to allocate waters in a way that maximizes the net benefits to the people of the state and to retain "base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

values." RCW 90.54.020(3)(a). Included in this mandate is the authority to establish minimum water flows and water levels (RCW 90.03.247 and RCW 90.22.010), base flows, and WRIAs. RCW 90.54.040. At this time, the legislature also made Ecology the primary administrator of chapter 90.03 RCW, concerning surface waters, and of chapter 90.44 RCW, concerning groundwater. *See* ch. 43.27A RCW.

By 1979, however, "public policy had dramatically changed from what had been true when the water code was first enacted." *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 595. Replacing the 1917 policies encouraging "maximum diversion of water" were the modern policies of "[o]btaining maximum benefits, prudent management of the state's water resources with input of interested entities, preservation of water within the streams and lakes as necessary for instream and natural values, and avoidance of wasteful practices." *Id.* at 595-96.

In order to obtain the maximum benefit from the state's water resources, the legislature tasked Ecology with developing WRIAs. RCW 90.54.040(1), (2). Beginning in 1985, Ecology developed the Nooksack Rule (WRIA 1), the first of 62 WRIAs designated, described, and subject to rules promulgated by Ecology. *See generally* chs. 173-501 to 173-564 WAC. Though specific rules apply to each of these WRIAs, *see id.*, they generally share the purpose "to retain perennial rivers, streams, and lakes in [the WRIAs] with instream flows and levels necessary to provide for preservation of wildlife, fish, scenic, aesthetic, and other environmental values, and navigational values, as well as recreation and water quality." WAC 173-501-020; *see also* RCW 90.54.020(3).

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In 1990 and 1991, the legislature addressed issues related to water use when it enacted the GMA "'in response to public concerns about rapid population growth and increasing development pressures in the state.'" *King County*, 142 Wn.2d at 546 (quoting Alan D. Copsey, *Including Best Available Science in the Designation and Protection of Critical Areas Under the Growth Management Act*, 23 SEATTLE U. L. REV. 97 (1999)). This legislation followed "decades of lax and optional land use regulations." *Quadrant Corp.*, 154 Wn.2d at 232. Through the GMA, the legislature sought to minimize "uncoordinated and unplanned growth," which it found to "pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state." RCW 36.70A.010.

Importantly, the GMA concentrates future growth into urban growth areas. *See* RCW 36.70A.110. Through this requirement, "the Act seeks to minimize intrusion into resource lands and critical areas, preserve large tracts of open space easily accessible to urban residents, foster a sense of spatial identity by separating communities with great expanses of sparsely populated rural land, and induce sufficient development density to be efficiently served by mass transportation and other public facilities." Settle, *supra*, 23 SEATTLE U. L. REV. at 12. Put another way, the Act concentrates development in cities and discourages development and will "attempt to wean Washingtonians from the sprawling, low-density development patterns that have prevailed throughout the nation since World War II." *Id.* at 12-13.

The GMA reinforces the conservation goals and priorities first established in the WRA by requiring local governments to plan for the protection of their local environment. The GMA requires counties to adopt a comprehensive plan and

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

development regulations consistent with the comprehensive plan. *See* RCW 36.70A.040. Among other requirements, comprehensive plans must include a rural element that harmonizes the Act's goals with local circumstances and also protects the rural characteristics of the area. *See* RCW 36.70A.070(5)(a), (c). Protecting the rural character of the area requires planning to protect surface and groundwater resources. RCW 36.70A.070(5)(c)(iv).

### B. The GMA requires counties to have a comprehensive plan that protects surface and groundwater resources

We hold that the Board properly concluded that the GMA requires counties to make determinations of water availability. The language placing this burden on the county or local government is clear, consistent, and unambiguous throughout the Act.

We begin with the plain language of the statute. *Ass'n of Wash. Spirits & Wine Distribs.*, 182 Wn.2d at 350. When the language is clear, we look only to the wording of the statute. *W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 609, 998 P.2d 884 (2000). The language of chapter 36.70A RCW, entitled "Growth Management—Planning by Selected Counties and Cities," is clear. RCW 36.70A.040, **"Who must plan—Summary of Requirements,"** provides in part:

> (1) Each county [subject to the Act] shall conform with all of the requirements of [chapter 36.70A RCW].

Subsection .040(3) outlines the duties of the county's legislative authority and each city located within the county to conform to the Act's mandates, starting with "adopt[ing] a countywide planning policy under RCW 36.70A.210," and then places specific duties on the county. This language clearly requires the county legislative authority—and not Ecology—to take planning action, including adopting a

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

comprehensive plan.

Language placing the burden on counties to take action is consistent throughout the GMA. "Counties shall include a rural element" in their comprehensive plans. RCW 36.70A.070(5). These rural elements must protect the rural character of the area "as established by the county." RCW 36.70A.070(5)(c). The GMA also places the onus on counties to ensure that their development regulations and comprehensive plans comply with the GMA. RCW 36.70A.130(1)(a) ("a county or city shall . . . ensure the plan and regulations comply with the requirements of this chapter.").

The GMA requires counties to consider and address water resource issues in land use planning. Specifically, a county's comprehensive plan must "provide for protection of the quality and quantity of groundwater used for public water supplies." RCW 36.70A.070(1). The GMA also requires counties to plan for a rural element that "include[s] measures that . . . protect . . . surface water and groundwater resources." RCW 36.70A.070(5)(c)(iv). Read as a whole, it is clear that the GMA holds counties "responsible for land use decisions that affect groundwater resources." *Kittitas County*, 172 Wn.2d at 180.

## C. The County's comprehensive plan conflicts with the GMA

The GMA requires that an applicant for a building permit for a single family residence or a development must produce proof that water is both legally available and actually available. But the County does not require any showing that water is available for a building permit when the applicant is relying on permit-exempt water appropriation. This failure by the County is the crux of this case.

The GMA places specific requirements on local governments when approving

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

building permits or authorizing subdivisions. *See* RCW 19.27.097(1); RCW 58.17.110(2).[6] In order to comply with the GMA, counties must receive sufficient evidence of an adequate water supply from applicants for building permits or subdivisions before the county may authorize development. RCW 19.27.097(1) provides in relevant part:

> Each applicant for a building permit of a building necessitating potable water shall provide evidence of an adequate water supply for the intended use of the building.

In addition, RCW 58.17.110(2) provides:

> A proposed subdivision and dedication shall not be approved unless the city, town, or county legislative body makes written findings that: (a) Appropriate provisions are made for . . . potable water supplies . . . .

Through these statutes, the GMA requires counties to assure that water is both factually and legally available. *Kittitas County*, 172 Wn.2d at 179-80.

The dissent focuses solely on the text of RCW 19.27.097 and concludes that "adequate," as the term is used in the statute, requires a permit applicant to demonstrate that water is merely factually available. This narrow interpretation of "adequate" ignores our discussion in *Kittitas County* and fails to appreciate the larger GMA scheme. In *Kittitas County*, we rejected the argument that the GMA required only

---

[6] The dissent places undue significance on RCW 19.27.097's location within the state building code. Dissent at 3-4. Though contained within Titles 19 and 58 RCW, both RCW 19.27.097 and 58.17.110(2) are part of the GMA. The legislature enacted the GMA in 1990 and amended the GMA in 1991. RCW 19.27.097 was in the 1990 act and amended in 1991. *See* LAWS OF 1990, 1st Ex. Sess., ch. 17, § 63; LAWS OF 1991, Spec. Sess., ch. 32, § 28. RCW 58.17.110(2) was amended by the 1990 act. *See* LAWS OF 1990, ch. 17, § 52. While the dissent correctly notes that RCW 19.27.097 contains separate requirements for GMA and non-GMA counties, this does not give this court grounds to ignore the rest of the GMA. We must read RCW 19.27.097 in conjunction with the larger GMA statutory scheme of which it is a part. *See* *Campbell & Gwinn*, 146 Wn.2d at 9-11.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

a showing of factual availability in order to obtain a building permit from the county. *Id.* Instead, we held that the GMA requires counties to "plan for land use in a manner that is consistent with the laws regarding protection of water resources." *Id.* at 180. Were we to read the GMA to require counties to assure merely that "water is physically underground," it would allow the county to condone the evasion of existing water rights, contrary to law. *Id.*

Further, because the dissent fails to read this statute in conjunction with related provisions within the GMA, the dissent ignores the responsibility the GMA places on counties to protect groundwater resources under RCW 36.70A.070. When read as a whole, the GMA places the burden on counties to protect groundwater resources, and requires counties to assure that water is both factually and legally available before issuing building permits.[7]

Here, the County's existing comprehensive plan does not require the County to make a determination of water availability. Instead, the comprehensive plan relies on determinations of water availability provided by Ecology's Nooksack Rule, chapter 173-501 WAC.

The Nooksack Rule establishes minimum flows for 48 basins in WRIA 1, covering the County. WAC 173-501-030. Most of the 48 basins are closed, and over half of the basins are closed year-round because they are already overdrawn. *See* WAC 173-501-040; *see also* BECKY PETERSON ET AL., 2010 WRIA 1 STATE OF THE

---

[7] The dissent notes that this interpretation of RCW 19.27.097 may result in differences between GMA and non-GMA counties in the level of protection for water rights holders. However, the legislature has created a distinction between GMA counties and non-GMA counties, and the resulting differences in resource management between those counties is a natural consequence of this legislation.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

WATERSHED REPORT 10 (2011). However, the Nooksack Rule establishes two tiers of "closed" basins in WRIA 1: basins closed to all appropriations except permit-exempt appropriations and basins closed to all appropriations including permit-exempt appropriations. *See* WAC 173-501-040(1), -070(2). Despite significant evidence that minimum flows are not met in rural Whatcom County, Whatcom Creek is the only basin—out of 48 basins in WRIA 1—closed to permit-exempt appropriations. WAC 173-501-070. Thus, the Nooksack Rule does not restrict permit-exempt wells from appropriating water in otherwise closed basins.

The County interprets the Nooksack Rule to mean that water is actually available for permit-exempt appropriations in otherwise closed basins, even if the basin is closed because the watercourses fall below minimum flows during all or parts of the year. The Board correctly rejected this interpretation. The Board found that despite substantial evidence of impaired instream flows, the County continues to authorize development relying on permit-exempt groundwater appropriations in otherwise closed basins. FDO at 42. The County's deference to the Nooksack Rule as a substitute for an actual determination of water availability expressly allows permit-exempt appropriations to interfere with established minimum flows because the Nooksack Rule exempts these appropriations from minimum flow requirements. *See* WAC 173-501-030(3), -060, -070(2). The result is an unchecked reduction of minimum flows unless and until Ecology closes a basin to all future appropriations. *See* WAC 173-501-070(2).

In ruling that the County's comprehensive plan does not provide for the protection of water availability, the Board specifically found amended rural element

22

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

policies 2DD-2.C.6 and -2.C.7 noncompliant with the GMA. These policies incorporate provisions of the WCC.[8] In turn, the incorporated provisions of the WCC defer to the Nooksack Rule by excluding the permit-exempt groundwater appropriations from the need to demonstrate water availability and by authorizing permit-exempt groundwater appropriations in otherwise closed basins. *See* WCC 24.11.090(B)(3) (the director will approve an application for a permit-exempt water appropriation only if the appropriation "does not fall within the boundaries of an area where [Ecology] has determined by rule that water for development does not exist"), .160(D)(3) (same), .170(E)(3) (same).

These policies are contrary to the requirements of the GMA. As noted, amended rural element policies 2DD-2.C.6 and -2.C.7 specifically incorporate WCC 21.04.090, WCC 21.05.080(3), and WCC 24.11.050, which are WCC provisions governing public and private water systems. Each of these ordinances requires an applicant for a public or private water system to make a showing of water availability to withdraw more than a total of 5,000 gallons per day. But as the Board noted at page

---

[8] Whatcom County Comprehensive Plan policy 2DD-2.C.6:

> Limit water withdrawals resulting from land division through the standards in the following Whatcom County Land Division regulations, adopted herein by reference:
>
> a.   WCC 21.04.090 Water supply, Short Subdivisions
> b.   WCC 21.05.080 Water supply, Preliminary Long Subdivisions.

Whatcom County Comprehensive Plan policy 2DD-2.C.7:

> Regulate groundwater withdrawals by requiring purveyors of public water systems and private water system applicants to comply with Washington State Department of Ecology ground water requirements per WCC 24.11.050, adopted herein by reference.

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

42 of the FDO, "ultimately, a building permit for a private single-residential well does not require the applicant to demonstrate that groundwater withdrawal will not impair surface flows."

Indeed, the County's rules for approving permit-exempt applications authorize groundwater appropriations in otherwise closed basins. The County asserts that its comprehensive plan protects surface flows because it provides that the director will approve an application for a permit-exempt water appropriation only if the appropriation "does not fall within the boundaries of an area where [Ecology] has determined by rule that water for development does not exist." WCC 24.11.090(B)(3), .160(D)(3), .170(E)(3). In effect, these ordinances provide that the County determines water availability by referencing the minimum flows and basin closures established by the Nooksack Rule. The problem is that the Nooksack Rule—including the minimum flows and closed basins established by the rule—does not regulate or otherwise restrict permit-exempt uses. *See* WAC 173-501-070(2). The County thus reasons that water is always available for permit-exempt appropriations. In reality, the County's incorporation of the Nooksack Rule authorizes permit-exempt groundwater appropriations that draw from minimum flows and otherwise closed basins, setting up a conflict with the County's obligation to protect water availability under the GMA.

*D. The County's plan fails to protect the availability of water resources*

Recognizing the conflict between the GMA and the Nooksack Rule, the Board properly held the County to the requirements imposed by the GMA. The Board ruled that policy 2DD-2.C.7 does not comply with the requirements of the GMA because under the policy, "a building permit for a private single-residential well does not require

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.,* No. 91475-3

the applicant to demonstrate that groundwater withdrawal will not impair surface flows." FDO at 42. This violates the requirement in RCW 19.27.097(1) that applicants "for a building permit of a building necessitating potable water shall provide evidence of an adequate water supply." *See also* RCW 58.17.110(2) (proposed subdivisions shall not be approved without evidence of adequate potable water). Further, the Board found that policy 2DD-2.C.7 "fails to limit rural development to protect ground or surface waters with respect to permit-exempt wells as required by RCW 36.70A.070(5)(c)(iv)." FDO at 42.

As discussed in Section II.B of this opinion, *supra*, the County's policies incorporate WCC provisions that do not allow water to be withdrawn from "an area where [Ecology] has determined by rule that water for development does not exist." WCC 24.11.090(B)(3), .160(D)(3), .170(E)(3). As counsel conceded at oral argument, these ordinances further provide that an application for a permit-exempt appropriation will be approved without any analysis of that withdrawal's impact on instream flows.[9] The Board found that these provisions result in water withdrawals from closed basins and senior instream flows—flows that the record indicated drop below the minimum levels 100 days out of the year. The Board properly held that this conflicts with the requirement placed on counties to protect water availability under the GMA, as well as our holding in *Postema*, 142 Wn.2d 68.[10]

---

[9] Wash. Supreme Court oral argument, *Whatcom County v. Hirst*, No. 91475-3 (Oct. 20, 2015), at 3 min., 25 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

[10] The dissent relies on a 1992 attorney general opinion (AGO) to support its conclusion that RCW 19.27.097 does not require proof of the legal availability of water. Dissent at 10-12. We do not read the AGO to support this conclusion. Rather, the AGO recognizes that in order to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

The County's adoption of the Nooksack Rule with its presumption that water is available for permit-exempt appropriations fails to satisfy the protective purposes and requirements of the GMA. As Ecology acknowledges in its amicus briefing, the Nooksack Rule is "[b]ased on the scientific understanding [in 1985, when] Ecology determined that only limited instances would occur in which groundwater withdrawals might impair instream flows." Ecology's Amicus Curiae Br. at 19-20. But "Ecology's understanding of hydraulic continuity has altered over time," and the effects of groundwater withdrawals on surface waters are well known. *Postema*, 142 Wn.2d at 76. Indeed, the County knew in 1999 that the proliferation of rural, permit-exempt wells was creating "'difficulties for effective water resource management.'" FDO at 24 (quoting Ex. C-671-D at 49). The County cannot reasonably rely on this regulation to satisfy its responsibility under the GMA to protect water availability.

Indeed, the County's reliance on the Nooksack Rule turns the GMA goal of directing growth to urban areas upside down. The County's comprehensive plan allows the unchecked growth of single domestic dwellings relying on permit-exempt

---

assure "adequate" water supply, a local county requires proof of both sufficient quantity and quality before issuing a building permit. 1992 Op. Att'y Gen. No. 17, at 7. Additionally, the AGO recognizes due to our state's "first in time, first in right" water priority system, a local building authority might have to require more than a right to withdraw groundwater by Ecology permit or exemption in order to meet the "adequacy" requirement, and might require proof of legal availability. *See id.* at 11 n.5. However, the AGO fails to fully consider counties' responsibilities under the GMA when permit-exempt wells impede minimum flows. While we give opinions of the attorney general considerable weight, they are not controlling on this court. *Wash. Fed'n of State Emps. v. Office of Fin. Mgmt.*, 121 Wn.2d 152, 164, 849 P.2d 1201 (1993). Further, we give less deference to such opinions when they involve issues of statutory interpretation. *Id.* While the AGO is not inconsistent with our decision today, we decline to give it weight or consideration here because we find it of limited application to the specific facts of this case, and because it fails to interpret RCW 19.27.097 within the larger GMA statutory scheme.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

wells in rural areas; this is precisely the "uncoordinated and unplanned growth" that the legislature found to "pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state." RCW 36.70A.010.

The County argues that placing responsibility for protecting water resources on local governments transfers Ecology's statutory responsibility to administer chapter 90.44 RCW to the counties. They are wrong under our description of the proper division of authority set forth in *Kittitas County*: "Ecology is responsible for appropriation of groundwater by permit . . . , the County is responsible for land use decisions that affect groundwater resources." 172 Wn.2d at 180.

Rather than address the language of the GMA, the County asserts that the proper inquiry is whether its comprehensive plan is consistent with Ecology's regulations designed to protect water and to ensure that water is legally available. For support, the County cites numerous provisions describing the GMA as a cooperative endeavor between local governments and state agencies with subject matter expertise. *See, e.g.*, RCW 90.54.130 (Ecology may provide local governments and state agencies with advisory recommendations to assist the counties in protecting water resources).

Notwithstanding the cooperative approach envisioned by the Act, the GMA clearly places sole responsibility for land use decisions affecting groundwater resources on local governments. Counties are authorized by statute to grant or deny building permits, and the legislature has imposed on the counties the responsibility of protecting the availability of water, RCW 36.70A.020(10), protecting groundwater

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

resources, RCW 36.70A.070(5)(c)(iv), and ensuring an adequate supply of water when it approves a building permit. RCW 19.27.097(1); RCW 58.17.110.

In contrast, the legislature recognized that Ecology plays an advisory role to counties making land use decisions by providing counties with model regulations and assistance. RCW 90.54.130; *Kittitas County*, 172 Wn.2d at 180. In counties required to plan pursuant to the GMA, the legislature recognized that Ecology's permitting authority could provide evidence of the availability of water (RCW 19.27.097(1)). And in counties that are not required to plan pursuant to the GMA, the legislature gave Ecology authority to coordinate with the Department of Health to determine whether an applicant must demonstrate the legal availability of water (RCW 19.27.097(2)). In addition, Ecology may provide local governments with advisory recommendations to assist those governments in protecting water resources. RCW 90.54.130. The legislature further recognized Ecology's administrative role in the GMA, stating that a county's land use regulations "should be consistent with . . . instream flow rules" promulgated by Ecology. WAC 365-196-825(3). Notably, none of these statutes authorize local governments to delegate their GMA planning responsibilities to Ecology.

Further, interpreting "assistance" to merely require counties to conform to existing regulations would render the GMA's water protection requirements superfluous. The legislature adopted the GMA in 1991, 20 years after the WRA and six years after Ecology promulgated the Nooksack Rule. As observed throughout this opinion, the Act places numerous requirements on local governments to protect the availability of water. *See* RCW 36.70A.070(1), (5)(c)(iv); *see also* RCW 19.27.097;

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

RCW 58.17.110. "Statutes must be interpreted and construed so that all the language is given effect, with no portion rendered meaningless of superfluous." *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010); *see also Tunstall v. Bergeson*, 141 Wn.2d 201, 211, 5 P.3d 691 (2000) ("To resolve apparent conflicts between statutes, courts generally give preference to the more specific and more recently enacted statute."). The GMA provisions would be superfluous if the County's only obligation was to defer to Ecology's water regulations.

The County specifically contrasts its cooperative efforts with the actions at issue in Kittitas County, where we affirmed the Board's finding of noncompliance in part because the policies in that case effectively evaded compliance with Ecology's water permitting requirements. *See Kittitas County*, 172 Wn.2d at 180-81. Asserting that its plan is entirely consistent with Ecology's regulations, the County urges us to find that its comprehensive plan is GMA compliant.

This argument is incongruous: the fact that the County's provisions are wholly consistent with Ecology's regulations does not, by itself, render them consistent with the GMA's requirements. We require counties "to plan for land use in a manner that is consistent with the laws regarding protection of water resources and establishing a permitting process." *Id.* at 180; *see also* WAC 365-196-825(3). However, nothing in *Kittitas County* or in the GMA suggests that consistency with Ecology's regulations is sufficient for GMA compliance. *See* 172 Wn.2d at 180-81. This argument rests on a logical fallacy. The GMA requires counties to have a comprehensive plan that protects surface and groundwater resources, and it requires applicants seeking approval for building permits or subdivision developments to provide that county with evidence of

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

an adequate water supplies as well as potable water supplies, among other provisions. *See* RCW 36.70A.070(5)(C)(iv); RCW 19.27.097(1); RCW 58.17.110. The Board correctly found that the County's plan does not satisfy these requirements.

It is true that the GMA places significant responsibility on local growth management planners and administrators to work with existing laws and regulations "toward producing a single harmonious body of law." WAC 365-196-700(2). However, the scope of this responsibility does not support a dilution of the Act's purpose. Recognizing the challenge this presents to local governments, the legislature directed the Department of Commerce to provide technical assistance to local governments. *See* RCW 36.70A.190. Additionally, Ecology was authorized to provide land use management advisory recommendations to state agencies and local governments in furtherance of protecting this state's water resources. RCW 90.54.130.

This cooperative approach is designed to give local governments the tools they need to make informed decisions toward achieving harmony under the GMA. However, the cooperative approach does not allow counties to disregard evidence of minimum flow impairments in reliance on an outdated regulation. The GMA is a mandate to government at all levels—municipalities, counties, regional authorities, special purpose districts, and state agencies—to engage in coordinated planning and cooperative implementation. WAC 365-196-700(5). In allocating responsibilities to achieve these policy goals, the legislature placed the responsibility to plan for the protection of water resources on county governments. *See Kittitas County*, 172 Wn.2d at 179.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

*E. The County plan is inconsistent with our minimum flows jurisprudence*

In addition to the deficiencies in the County's comprehensive plan under the GMA, the Board properly ruled that the plan is inconsistent with our decisions protecting closed basins and minimum flows from groundwater appropriations. There is no question that a permit-exempt well may not infringe on an earlier-established right to water under the doctrine of prior appropriation. *See Campbell & Gwinn*, 146 Wn.2d at 16. We reiterated this point in *Swinomish Indian Tribal Community*, recognizing that an appropriator's right to use water from a permit-exempt well is subject to rights with priority in time, including minimum flows. 178 Wn.2d at 598. The GMA protects these senior water rights by requiring local governments to determine that applicants for building permits or subdivision developments have demonstrated that an adequate water supply is legally available before authorizing approval. RCW 19.27.097(1); RCW 58.17.110.

Here, the Board specifically found that the "water supply provisions referenced . . . do not require the County to make a determination of the legal availability of groundwater," with the result that the County's ordinance directly conflicts with the standard announced in *Postema*. FDO at 40. In *Postema*, we held that a minimum flow, once established by Ecology, is an existing water right that may not be impaired by subsequent groundwater withdrawals. 142 Wn.2d at 81. "Accordingly, when Ecology determines whether to issue a permit for appropriation of public groundwater, Ecology must consider the interrelationship of the groundwater with surface waters, and must determine whether surface water rights would be impaired or affected by groundwater withdrawals." *Id.* at 80-81. "[W]here there is hydraulic continuity and

31

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

withdrawal of groundwater would impair existing surface water rights, including minimum flow rights, then denial [of a permit] is required." *Id.* at 93.

Though *Postema* was specifically decided in the context of Ecology's requirements prior to issuing permits, the rule in Washington is that groundwater appropriations cannot impede minimum flows.[11] *Swinomish Indian Tribal Cmty.*, 178 Wn.2d at 598. It would be incongruous to limit *Postema* to the holding that Ecology must consider the effect of groundwater appropriations on minimum flows when issuing permits but that the County does not need to consider these same impacts when issuing building permits. The County emphasizes that Ecology expressly does not engage in the usual review of a permit application when considering permit-exempt wells and exempt-use applications are not reviewed for impairment of existing rights. This argument misses the mark—the GMA explicitly assigns that task to local governments. *See* RCW 19.29.097(1); RCW 58.17.110.

A recent decision from Division One of the Court of Appeals in *Fox v. Skagit County*, 193 Wn. App. 254, ___ P.3d ___ (2016), *petition for review filed*, No. 93203-4 (Wash. June 7, 2016),[12] lends further support to the conclusion that counties must

---

[11] In *Postema*, we considered Ecology's denial of applications for groundwater appropriation permits on the basis that groundwater sources are in hydrological continuity with surface water sources and further appropriations were foreclosed under RCW 90.03.290. 142 Wn.2d at 77-78. In analyzing whether Ecology properly denied permits under RCW 90.03.290, we considered the statutory requirements placed on Ecology to consider the interrelationship between surface waters and groundwater in issuing permits and asserted that Ecology "must determine whether surface water rights would be impaired or affected by groundwater withdrawals." *Id.* at 80-81. This was particularly relevant because RCW 90.03.290, which authorizes Ecology to issue permits for water appropriation, "does not . . . differentiate between the impairment of existing rights based on whether the impairment is de minimis or significant." *Id.* at 90.

[12] The decision of the Court of Appeals in *Fox* was issued after oral argument in the present

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

consider minimum flows when issuing building permits, even for developments relying on permit-exempt wells. The case concerned the denial of a building permit where the only source of water for the proposed development was from a permit-exempt well in hydraulic continuity with a river that was subject to an instream flow rule, and that regularly falls below its minimum flow requirements. *Id.* at 260. The Court of Appeals rejected the argument that a permit-exempt well would satisfy on its own the "adequate water supply" requirement for a building permit under RCW 19.27.097. *Id.* at 269-70. Because the right to use a permit-exempt well is subject to the prior appropriation doctrine, the court held that a determination of water availability for purposes of issuing a building permit requires that the county consider whether the development would impair senior water rights, including rights established by an instream flow rule. *Id.* The opinion in *Fox* is consistent with our prior decisions in *Kittitas County*, *Swinomish Indian Tribal Community*, and *Postema*, and with our decision today.

By deferring to Ecology's Nooksack Rule, the County authorizes building permits on a presumption of water availability in lieu of the GMA's requirement of

---

case had occurred. Petitioners submitted this additional authority to the Court for consideration. Appellant's Statement of Additional Authority at 1. In their statement, the petitioners quoted several passages from the opinion, prefacing each quote with a short statement about the context or meaning of the passage. Respondent County objected to petitioners' statement, claiming that it contained impermissible argument in violation of RAP 10.8. Objection to Appellants' Statement of Additional Authority at 1. Respondent asked this court to either reject the statement or, in the alternative, strike all argument from the statement. *Id.* at 2. Under RAP 10.8, a party should identify the issue for which the additional authority is offered but the statement "should not contain argument." We agree with the respondent that the petitioners' commentary on the quoted passages crosses the line between permissible identification and impermissible argument. We grant the respondent's motion to strike this language from petitioners' statement, but we decline to reject the statement in full.

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

"evidence of adequate water supply." As authorized by RCW 90.54.020(3), Ecology's Nooksack Rule established instream flows as "necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values" at WAC 173-501-030(1) to (3); these regulations expressly provide that only Whatcom Creek is closed to permit-exempt uses. *See* WAC 173-501-040(1), -070(2). However, the Nooksack Rule does not provide that water is legally available for permit-exempt uses in all other streams in WRIA 1. *See* WAC 173-501-040(1), -070(2); *see generally* ch. 173-501 WAC.

As the Board correctly states, each water use appropriation requires a fact-specific determination. RCW 19.29.097(1); RCW 58.17.110. Because the County's plan does not require applicants to present evidence of water availability, the unasked question in the County is whether there is water that is legally available and that can be appropriated in certain areas of rural Whatcom County without conflicting with the applicable instream flows. Instead of evidence, the County presumes that water is available for all permit-exempt wells unless Ecology has explicitly closed a basin to all groundwater appropriations, specifically including permit-exempt appropriations.[13] The Board correctly found that this approach has an adverse impact on minimum flows, that it does not comply with the GMA, and that it is incompatible with our

---

[13] Counties may not rely on Ecology's inaction in failing to close a basin as a determination that water is presumptively available for appropriation. Such inaction fails to provide any assurance that a new permit-exempt well will not infringe on senior water rights, and thus fails to satisfy the obligation the GMA places on counties to ensure that water is legally available before issuing a building permit. *See* RCW 19.29.097(1); RCW 58.17.110. However, if and when Ecology makes a determination to close a basin to all future appropriations, including permit-exempt appropriations, this positive action by Ecology amounts to a recognition that water is not available for any use, and may form a reasonable basis for a county to find that water is not legally available for further appropriation.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

decisions that consistently protect instream flows from impairment by groundwater withdrawals.

III.  The Board Properly Ruled That the County's Rural Element Fails To Comply with the Requirement To Protect Water Quality

We reverse the Court of Appeals in part and hold that the Board's ruling that the County's rural element does not comply with the requirement to protect water quality is based on a proper interpretation and application of the law. The County argues—and the Court of Appeals agreed—that the Board's reliance on preexisting water quality problems in Whatcom County improperly imposed a duty on the County to "enhance" water quality rather than to merely "protect" water quality. The County is correct that it does not have a duty to enhance water quality; however, the Board's ruling does not require counties to enhance water quality and the decision is supported by substantial evidence.[14]

A. *Comprehensive plans are not required to include provisions that enhance water quality*

The GMA imposes several requirements and goals on a local government's planning. Comprehensive plans *"shall* provide for *protection* of the quality . . . of groundwater used for public water supplies." RCW 36.70A.070(1) (emphasis added). It is a *goal* of the GMA to "[p]rotect the environment and *enhance* the state's high quality of life, including air and water quality." RCW 36.70A.020(10) (emphasis added).

---

[14] During oral argument, the County conceded that it had notice of two documents by the second hearing before the Board and that the documents were now properly a part of the record. *See* Wash. Supreme Court oral argument, *supra*, at 52 min., 45 sec. to 57 min., 17 sec. Based on this concession and our reasoning at Section III.B, *infra*, we do not address this procedural argument further.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Hirst urges us to hold that counties must "enhance" water quality, relying on the County's related argument that local governments must adhere to the "planning goals" and "[g]eneral declaration of fundamentals" found in RCW 34.70A.020 and RCW 90.54.020, respectively, such that a county's comprehensive plan must both "protect" and "enhance" water quality. However, nothing in the language of either statute or in our prior interpretations of the GMA goals support this interpretation.

Subsection .020 of the GMA, chapter 36.70A RCW, provides 13 planning goals to "guide the development and adoption of comprehensive plans and development regulations of those counties and cities that are required or choose to plan under [subsection .040]." The goals "are not listed in order of priority and shall be used exclusively for the purpose of guiding the development of comprehensive plans and development regulations." RCW 36.70A.020. Additionally, "the GMA 'explicitly denies any order of priority among the thirteen goals' and it is evident that 'some of them are mutually competitive.'" *Quadrant Corp.*, 154 Wn.2d at 246 (quoting Settle, *supra*, at 11). Nothing in this plain language suggests that GMA goals impose substantive requirements on local governments.

Indeed, we rejected a similar argument in *Swinomish Indian Tribal Community* when we held that the term "protect" does not impose a duty on counties to "enhance" water quality under RCW 36.70A.172(1). 161 Wn.2d at 428. There, we considered the Swinomish Tribe's argument that the requirement to "protect" critical areas under the GMA requires measures to "enhance" because "where an area is already in a degraded condition, it is not being protected unless that condition is improved or enhanced." *Id.* at 427. In rejecting that argument, we recognized that the term "protect"

36

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

may encompass an option of enhancement but that the term itself does not require enhancement. *Id.* at 429. We also considered the legislature's deliberate use of the terms "protect" and "enhance" throughout the GMA, finding that "[i]n several sections of the GMA, the legislature *allows* enhancement of natural conditions under the GMA without *requiring* enhancement." *Id.* We have acknowledged that RCW 36.70A.020 lists the enhancement of water quality as a goal of the GMA, *see id.*, but have never held that local governments are bound by these goals in addition to the enumerated requirements of the Act. *See Quadrant Corp.*, 154 Wn.2d at 246. We adhere to that holding here—the GMA does not require counties to "enhance" water quality.

Hirst's argument under the WRA fares no better than their argument under the GMA. Subsection .020 of the WRA, entitled "General declaration of fundamentals for utilization and management of waters of the state," reads in relevant part:

> Utilization and management of the waters of the state shall be guided by the following general declaration of fundamentals:
>
> . . . .
>
> (3) The quality of the natural environment shall be protected and, where possible, enhanced as follows:
>
> . . . .
>
> (b) Waters of the state shall be of high quality. Regardless of the quality of the waters of the state, all wastes and other materials and substances proposed for entry into said waters shall be provided with all known, available, and reasonable methods of treatment prior to entry. Notwithstanding that standards of quality established for the waters of the state would not be violated, wastes and other materials and substances shall not be allowed to enter such waters which will reduce the existing quality thereof, except in those situations where it is clear that overriding considerations of the public interest will be served. . . .
>
> . . . .

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

> (5) Adequate and safe supplies of water shall be preserved and protected in potable condition to satisfy human domestic needs.

RCW 90.54.020. The plain language of this section requires the quality of the natural environment to be "protected." Waters are protected in part when "wastes and other materials and substances" are not allowed to enter the waters when those materials will reduce the existing quality of the water. RCW 90.54.020(3)(b). The statute further provides that "[a]dequate and safe supplies of water shall be preserved." RCW 90.54.020(5). The language in the WRA does not suggest that water quality must be "enhanced," and it does not supersede language from the GMA requiring water to be "protected." These goals, while admirable, simply do not impose a duty on counties to enhance water quality.

### B. The Board's conclusion about water quality is not based on a duty to enhance water quality

The Board did not rule that the County had an obligation to enhance water quality. Its ruling that the County's policies relating to water quality do not satisfy the requirements of the GMA identifies two specific problems. We address these concerns in turn.

First, the Board concluded that the County policies 2DD.2.C.1, -2.C.3, -2.C.4, and -2.C.8 either do not apply throughout the County's rural area or apply only to parts of the rural area. *See* FDO at 36, 39, 43. The Board further found that "no measures exist to limit development to protect water resources in the remaining portions of the County's Rural Area." *Id.* at 38 (emphasis omitted); *see also id.* at 39 ("[T]he County's Stormwater Manual does not provide measures to protect groundwater throughout the County's Rural Area."). Given these deficiencies, the Board concluded that

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

> the County is left without Rural Element Measures to protect rural character by ensuring land use and development patterns are consistent with protection of surface water and groundwater resources throughout its Rural Area. This is especially critical given the water supply limitations and water quality impairment documented in this case . . . .

*Id.* at 43. The conclusion that these policies do not protect water quality is not based on a duty to enhance water quality.

Second, the Board found that policy 2DD-2.C.2 "is not a measure limiting development to protect water resources as required in RCW 36.70A.070(5)(c)(iv)." *Id.* at 37-38. This policy is implemented through chapter 24.05 WCC, which allows private homeowners in rural areas to inspect their own septic systems rather than requiring professional inspections. The Board noted significant disparity in reported failure rates and compliance rates between homeowners who self-inspect versus professional inspections, as well as studies showing water quality contamination from faulty septic systems. *Id.* at 37.

In essence, the Board ruled that the County's current inspection system policies were flawed and that continuing to rely on this flawed system would not protect water quality in the future. *See id.* at 36-39. This also does not impose a duty on counties to enhance water quality. We therefore reverse the Court of Appeals and hold that the Board applied the proper legal standard and analysis in concluding that the County's rural element policy does not comply with the GMA.

The County also asserts that the Board's findings are not supported by substantial evidence. We note that the Board cited a "proliferation of evidence in the record of continued water quality degradation resulting from land use and development activities," *id.* at 35, including scientific reports in Ecology's 2010 *State*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*of the Watershed Report*; Washington Department of Fish and Wildlife's *Land Use Planning for Salmon, Steelhead and Trout*; and the Puget Sound Partnership's *2012/2013 Action Agenda for Puget Sound.* KATIE KNIGHT, WASH. DEP'T OF FISH & WILDLIFE, LAND USE PLANNING FOR SALMON, STEELHEAD, AND TROUT: A LAND USE PLANNER'S GUIDE TO SALMONID HABITAT PROTECTION AND RECOVERY (2009) (WDFW 2009 REPORT); PUGET SOUND P'SHIP, THE 2012/2013 ACTION AGENDA FOR PUGET SOUND (2012). These reports conclude that water resource degradation in the County can be attributed to land use and land development practices. FDO at 32-33 (citing WDFW 2009 REPORT, *supra*, at 77 (2009)). These reports also determined that "'stormwater runoff is the leading contributor to water quality pollution of urban waterways in western Washington State.'" *Id.* at 32 (quoting WDFW 2009 REPORT, *supra*, at 39-40).

The County's arguments dismissing this evidence as merely "generalized evidence of water quality problems" miss the point: as the Board properly observed, counties must include protective measures in their comprehensive plan. *Id.* at 35 (citing *Kittitas County*, 172 Wn.2d at 164). The Board's conclusion that the County plan does not have the necessary measures to comply with this requirement is all that is needed to establish that the County's comprehensive plan does not satisfy the GMA. The evidence cited by the Board is not essential to this ruling; it is instead intended to underscore the importance of implementing effective protective measures in rural Whatcom County. Therefore, we reverse the Court of Appeals' holding that the Board's decision improperly imposed a duty on the County to "enhance" water quality

40

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

rather than to merely "protect" water quality and affirm the Board's ruling that the County's rural element fails to comply with the requirement to protect water quality.

IV.    The Board Has Discretion To Declare a Comprehensive Plan Invalid

Finally, Hirst cross appeals the Board's decision declining to declare the County's comprehensive plan invalid. Hirst argues that the Board erroneously interpreted and applied the GMA because it applied an incorrect legal standard. We hold that the Board did not abuse its discretion in declining to make a determination of invalidity.

The GMA provides statutory remedies for plans or regulations that the Board determines violate the GMA. As we have previously observed when interpreting these provisions, the GMA provides the Board with "two options: (1) it may enter a finding of noncompliance or (2) it may enter a finding of invalidity." *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 174, 322 P.3d 1219 (2014) (citing RCW 36.70A.300(3)(b), .302). We review the Board's exercise of these options for abuse of discretion. *See id.*

RCW 36.70A.302(1) provides the legal standard under which the Board determines whether to make a finding of invalidity:

> (1)    The board *may* determine that part or all of a comprehensive plan or development regulations are invalid if the board:
> (a)    Makes a finding of noncompliance and issues an order of remand under RCW 36.70A.300;
> (b)    Includes in the final order a determination, supported by findings of fact and conclusions of law, that the continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter; and
> (c)    Specifies in the final order the particular part or parts of the plan or regulation that are determined to be invalid, and the reasons for their invalidity.

41

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

(Emphasis added.) The legislature's use of the term "may" generally indicates the existence of an option that is a matter of discretion. *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 28, 978 P.2d 481 (1999) (citing *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 381, 858 P.2d 245 (1993)); *see also* WAC 365-196-210(20).

In denying Hirst's request for an order of invalidity, the Board stated:

> This Board has previously held that it will declare invalid only the most egregious noncompliant provisions which threaten the local government's future ability to achieve compliance with the Act. Although the Board finds areas of noncompliance with the GMA, Petitioners have not met the standard for a declaration of invalidity.

FDO at 50 (footnote omitted).

Hirst argues, correctly, that the GMA standard for a determination of invalidity is not "the most egregious noncompliant provisions which threaten the local government's future ability to achieve compliance with the Act." While this is a correct statement of the law, it is irrelevant to determining whether the Board properly exercised its discretion by requiring a heightened showing before it elects to invalidate a noncompliant provision. As the quoted language shows, the Board is asserting its own standards for invalidating provisions. Hirst's argument fails to acknowledge that the plain language of subsection .302(1) articulates the threshold requirements for a board to make a determination of invalidity; a board may not make a determination of invalidity if those requirements are not satisfied, but it is not required to make a finding of invalidity if they are. *Cf. Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 578, 309 P.3d 673 (2013) (Board's determination of invalidity satisfied

42

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

the statutory requirements and was based on due consideration of the facts), *review denied*, 179 Wn.2d 1015 (2014). Therefore, we affirm the Court of Appeals on this issue and hold that the Board did not abuse its discretion in declining to make a finding of invalidity.

## CONCLUSION

We reverse the Court of Appeals and hold that the County's comprehensive plan does not satisfy the GMA requirements to protect water availability or water quality. However, we affirm the Court of Appeals' holding that the Board did not abuse its discretion in declining to make a finding of invalidity. We therefore reverse the Court of Appeals in part and remand to the Board for further proceedings consistent with this opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

_____ Wiggins, J.

WE CONCUR.

*Whatcom County, Hirst (Eric) v. W. Wash. Growth Mgmt. Hr'gs Bd.*, No. 91475-3

44

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, et al. v. W. Wash. Growth Mgmt. Hr'gs Bd.*

No. 91475-3

MADSEN, C.J. (concurring)—I agree with the majority that the Growth Management Act (GMA), chapter 36.70A RCW, places a burden on counties to assure the factual and legal availability of water before issuing building permits. And Whatcom County (County) failed to meet this burden by simply relying on the Department of Ecology's "Nooksack Rule"[1] rather than actually making a finding that water was available. I write separately to emphasize the duty of the State, tribes, and local governments to work together to ensure there is available water before issuing building permits, rather than letting their burden fall onto individual permit applicants.

Discussion

The majority holds that the County failed to meet its duty under the GMA to ensure water was factually and legally available before issuing building permits. Majority at 2, 13. I agree with this holding. The GMA places a duty on counties to ensure that water is both factually and legally available before they issue building permits. RCW 19.27.097(1); RCW 58.17.110(2); *see* majority at 18-20. This court has

---

[1] The Nooksack Water Resource Inventory Area, chapter 173-501 WAC.

91475-3
Madsen, C.J., concurring

recognized this duty before. *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172

Wn.2d 144, 179-80, 256 P.3d 1193 (2011); *see* majority at 20-21.

Here, the County failed to ascertain whether there was available water before

issuing building permits. Rather, the County shifted its statutory duty under the GMA to

the Department of Ecology by adopting Ecology's presumptive Nooksack Rule. Where,

as here, Ecology has not actually determined whether water is available, the County is not

entitled simply to rely on Ecology's rule.[2] As the majority holds, the County has an

independent duty under the GMA to ensure water is both factually and legally available

before issuing building permits.

I write separately to address the dissent's concern that the majority is shifting the

burden of showing water availability onto individual permit applicants. Dissent at 1, 16.

Like the dissent, I fear the majority could be read to say that if the County cannot rely on

Ecology's rule, then it can shift its burden onto permit applicants. But that is not so.

Rather, the State and local governments have independent statutory duties to ensure water

availability, and they must work together to protect water resources and ensure water

availability as part of their comprehensive planning process.[3]

---

[2] By adopting the Nooksack Rule, the County *presumes* there is an adequate supply to provide water for a permit-exempt well unless Ecology has expressly closed that area to permit-exempt appropriations. Majority at 2. As the majority notes, this means the County's position is that "water is presumptively available—i.e., that 'not unavailable' is synonymous with 'available.'" *Id.* at 9. For further discussion of the Nooksack Rule, see *id.* at 21-22.

[3] Ecology is, of course, not a party to this case, so this court cannot direct what it must do to assist the County in the development of a comprehensive plan and zoning code that meets the County's obligations under the GMA. But this case presents an opportunity to highlight the

2

91475-3
Madsen, C.J., concurring

The State and the counties each have an independent statutory duty to ensure water availability. For example, before issuing a groundwater permit, Ecology *must* investigate and affirmatively find "(1) that water is available, (2) for a beneficial use, and that (3) an appropriation will not impair existing rights or (4) be detrimental to the public welfare." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 8, 43 P.3d 4 (2002) (citing RCW 90.03.290). Under the GMA, a county's comprehensive plan, RCW 36.70A.040, *must* include a land use element that provides for the "protection of the quality and quantity of groundwater used for public water supplies." RCW 36.70A.070(1). And before issuing a building permit, a county *must* determine that there are potable water supplies. RCW 58.17.110(2)(a). Thus, both the State and the counties have an independent duty to ensure water availability prior to issuing permits.

Although each has an independent statutory duty, the legislature envisioned cooperation between the State and local governments when it enacted the Water Resources Act of 1971 (WRA), chapter 90.54 RCW, and, later, the GMA. The legislature included language highlighting this cooperative approach throughout the statutes:

> To ensure that available water supplies are managed to best meet both instream and offstream needs, a comprehensive planning process is essential . . . . Through *a comprehensive planning process that includes the state, Indian tribes, local governments*, and interested parties, it is possible to make better use of available water supplies and achieve better management of water resources. Through comprehensive planning,

---

generally applicable importance of comprehensive planning between the State and local governments under the Water Resources Act of 1971, chapter 90.54 RCW, and the GMA.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

91475-3
Madsen, C.J., concurring

> conflicts among water users and interests can be reduced or resolved. It is
> in the best interests of the state that comprehensive water resource planning
> be given a high priority.

RCW 90.54.010(1)(b) (emphasis added); RCW 36.70A.103 (state agencies shall comply

with local comprehensive plans), .106(1) (state agencies may provide comments to local

governments on a proposed comprehensive plan); RCW 19.27.097(2) (county and state

may mutually determine to which areas the building permit requirements do not apply);

*see also* WAC 365-196-700(5) ("The [WRA] is a mandate to government at all levels to

engage in coordinated planning and cooperative implementation.").

This court has recognized the cooperative spirit that the legislature envisioned

when enacting these statutes. In *Kittitas County*, while reaffirming the county's

responsibility in land use decisions, we emphasized, "[W]e do not intend to minimize the

role of Ecology. *Ecology maintains its role*, as provided by statute, *and ought to assist

counties* in their land use planning to adequately protect water resources." 172 Wn.2d at

180 (emphasis added). The majority too recognizes the cooperative approach that the

GMA envisions. Majority at 27. But the majority focuses on how the County cannot use

the cooperative approach to "disregard evidence of minimum flow impairments in

reliance on an outdated regulation." *Id.* at 30. While I agree, I think it should be made

clear that the statutes do not expect the burden to fall on individual applicants where the

County has failed to meet its initial burden of determining water availability through its

comprehensive planning and development regulations.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

91475-3
Madsen, C.J., concurring

When the counties and Ecology combine their planning and water resources authority, the technical resources and planning solutions offer a wide range of tools to ensure water availability. For example, a county can make its densities consistent with water availability, provide water mitigation, or ensure there are limited impervious surfaces so that more water goes into streams.[4] Although the legislature has placed a burden on individual applicants to provide evidence of water, RCW 19.27.097(1), there are steps that the State and the counties *must* take under their statutory duties to protect water resources, ensure water availability, and engage in a comprehensive planning process. The burden on permit applicants under RCW 19.27.097(1) assumes that the State and the counties have already complied with their statutory duties to ensure the availability of water. Thus, the burden to provide evidence of water falls on individual applicants only where the State and the counties have first fulfilled their statutory duties of ensuring that water is available.

The State and the counties cannot meet their respective duties to protect this State's dwindling water resources by relying on one another's rules or shifting their burdens to others. As stewards of our valuable water resources, the State and the counties must work together to develop comprehensive plans to address water usage in

---

[4] Wash. Supreme Court oral argument, *Whatcom County v. Hirst*, No. 91475-3 (Oct. 20, 2015), at 30 min., 50 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. *See also Kittitas County Conserv. Coal. v. Kittitas County*, Nos. 07-1-0004c & 07-1-0015, 2014 WL 4809403, at *8-11 (E. Wash. Growth Mgmt. Hr'gs Bd. Aug. 13, 2014) (detailing the comprehensive plan, developed after remand from this Court in *Kittitas County*, 172 Wn.2d 144, found in compliance with the GMA).

5

91475-3
Madsen, C.J., concurring

our State. RCW 90.54.010(b). I write separately to emphasize it is the burden of the State and local governments, independently and in cooperation, to determine water availability in the first instance. This is not a burden to be shifted onto individual permit applicants.

91475-3
Madsen, C.J., concurring

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

91475-3
Madsen, C.J., concurring

_Madsen, C.J._

*Whatcom County, Hirst (Eric), et al. v. W. Wash. Growth Mgmt. Hr'gs Bd.*

No. 91475-3

STEPHENS, J. (dissenting)—The majority's decision hinges on an interpretation of RCW 19.27.097 that is unsupported by the plain language of the statute, precedent, or common sense. It assumes this provision of the building code requires Whatcom County to determine water right priorities before it may grant a building permit that relies on a permit-exempt well. It also assumes this provision prohibits the county from relying on the Department of Ecology's determination of whether water is available for withdrawal in a particular basin. The effect of the majority's holding is to require individual building permit applicants to commission a hydrogeological study to show that their very small withdrawal does not impair senior water rights, and then have the local building department evaluate the adequacy of that scientific data. The practical result of this holding is to stop counties from granting building permits that rely on permit-exempt wells. Not only

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

is this contrary to the clear legislative purpose of RCW 19.27.097, it potentially puts

counties at odds with the Department of Ecology and imposes impossible burdens

on landowners. I respectfully dissent.

I. *RCW 19.27.097 Does Not Require Building Permit Applicants To Provide Evidence of the Legal Availability of Water*

The majority holds that to satisfy the Growth Management Act (GMA),

chapter 36.70A RCW, the county cannot rely on the Department of Ecology's water

availability determinations, but instead must require building permit applicants

relying on permit-exempt wells to provide the county with evidence that water is

both factually and legally available. *See* majority at 19-20. The majority's holding

relies on a faulty interpretation of RCW 19.27.097. That statute provides in relevant

part,

> (1) Each applicant for a building permit of a building necessitating potable water shall provide evidence of an adequate water supply for the intended use of the building. Evidence may be in the form of a water right permit from the department of ecology, a letter from an approved water purveyor stating the ability to provide water, or another form sufficient to verify the existence of an adequate water supply. In addition to other authorities, the county or city may impose conditions on building permits requiring connection to an existing public water system where the existing system is willing and able to provide safe and reliable potable water to the applicant with reasonable economy and efficiency. An application for a water right shall not be sufficient proof of an adequate water supply.
>     (2) Within counties not required or not choosing to plan pursuant to RCW 36.70A.040, the county and the state may mutually determine those areas in the county in which the requirements of subsection (1) of this section shall not apply. The departments of health and ecology shall coordinate on the implementation of this section. Should the county and the state fail to

mutually determine those areas to be designated pursuant to this subsection, the county may petition the department of enterprise services to mediate or, if necessary, make the determination.

RCW 19.27.097.

While part of the GMA, this statute is codified in the building code, chapter 19.27 RCW. *See Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 178-79, 256 P.3d 1193 (2011). It sends a simple message to building permit applicants: "show me the water." It does not require counties to modify their growth management ordinances to deviate from the Department of Ecology's determination of whether water is available for use in a particular basin. Nor does it require applicants to undertake the burden of showing that the use of a permit-exempt well will not impair senior water rights.

The plain language of RCW 19.27.097 supports this interpretation. The methods that an applicant may use to show there is an "adequate water supply" speak to the actual presence of water, not its legal availability. RCW 19.27.097(1) ("Evidence may be in the form of . . . a letter from an approved water purveyor stating the ability to provide water."). Furthermore, the statute uses the term "adequate" to describe the water supply; it does not use "available." *Id.* This is important, as "[w]e presume the legislature intends a different meaning when it uses different terms." *Foster v. Dep't of Ecology*, 184 Wn.2d 465, 473, 362 P.3d 959

-3-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(2015). In the water code, where the legislature intends an investigation of both factual *and* legal availability of water, it uses the term "available." *See* RCW 90.03.290(1) (providing that under the water code's appropriation procedure, it is the duty of the Department of Ecology to "determine what water, if any, is *available* for appropriation" (emphasis added)), .290(3) ("if [the department] shall find that there is water *available* for appropriation for a beneficial use, and the appropriation thereof as proposed in the application will not impair existing rights or be detrimental to the public welfare, it shall issue a permit . . . . But where there is no unappropriated water in the proposed source of supply, or where the proposed use conflicts with existing rights," the department shall reject the application (emphasis added)). In GMA regulations, the term "adequate" refers to actual water supply, not legal availability. *See* WAC 365-196-210(3) (Department of Commerce GMA regulations defining "adequate public facilities" as "facilities which have the capacity to serve development without decreasing levels of service below locally established minimums"), -410(1)(d) ("The housing element must contain at least the following features: . . . [a]dequate provisions for existing and projected housing needs of all economic segments of the community.").

The majority's attempt to tie the GMA's broad policy objectives and planning goals to this statute overlooks the fact that RCW 19.27.097 applies to both GMA

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and non-GMA counties. The statute speaks directly to an individual applicant's burdens, not to the required elements of a county's comprehensive plan. *See* RCW 19.27.097(1) ("Each *applicant* for a building permit of a building necessitating potable water shall provide evidence of an adequate water supply for the intended use of the building." (emphasis added)). Although under this statute non-GMA counties can require building permit applicants to provide evidence of an adequate water supply, this is not mandated. In non-GMA counties, applicants may or may not have to show evidence of potable water. RCW 19.27.097(2) ("Within counties not required or not choosing to plan pursuant to RCW 36.70A.040, the county and the state may mutually determine those areas in the county in which the requirements of subsection (1) of this section shall not apply.").

The majority's holding, which requires applicants for a building permit in a GMA county to prove the legal availability of water, will lead to inconsistent protection for senior water rights holders across the state. *See* 1992 Op. Att'y Gen. No. 17, at 7 n.4 ("In areas where RCW 19.27.097(1) does not apply, the local building department will not need to determine whether there is an adequate water supply before issuing a building permit."). Under the majority's interpretation, senior water rights holders in GMA counties can rely on counties to look at applicants' evidence and deny building permits when permit-exempt wells would

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

interfere with senior water rights. However, in non-GMA counties where applicants
relying on permit-exempt wells do not have to prove water is legally available, senior
water rights holders bear the burden of determining a permit-exempt well is
interfering with their rights and initiating a lawsuit to stop the impairment.[1] We
cannot read the requirements of the building code to create such unequal protection
for senior water rights holders.

Noticeably missing from the majority's analysis of RCW 19.27.097 is any
discussion of the inconsistent protection its interpretation creates. The majority
brushes off this argument, stating, "While the dissent correctly notes that RCW
19.27.097 contains separate requirements for GMA and non-GMA counties, this
does not give this court grounds to ignore the rest of the GMA." Majority at 20 n.6.
This court should not interpret a statute so as to give people in some counties greater
protection for their water right than others, especially when the result is to foster
piecemeal decision-making regarding water use. By interpreting RCW 19.27.097 to
mean "show me the water" and allowing counties to rely on the Department of
Ecology's determination of whether water is *legally* available, I do not ignore the

---

[1] Permit-exempt wells that are regularly, beneficially used, are "entitled to a right
equal to that established by a permit." RCW 90.44.050. "The authority to adjudicate and
enforce water rights . . . is specifically granted to the superior courts . . . ." *Rettkowski v.
Dep't of Ecology*, 122 Wn.2d 219, 225, 858 P.2d 232 (1993), *aff'd in part and rev'd in
part*, 128 Wn.2d 508, 910 P.2d 462 (1996).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

other provisions of the GMA. Instead, I harmonize the GMA and the Water Resources Act of 1971 (WRA), chapter 90.54 RCW, and its goal of consistent decision-making—something the majority fails to do.

The WRA requires the Department of Ecology, "through the adoption of appropriate rules . . . to develop and implement . . . a *comprehensive* state water resources program which will provide a process for making decisions on future water resource allocation and use." RCW 90.54.040(1) (emphasis added). The ordinary meaning of "comprehensive" is "covering a matter under consideration completely or nearly completely." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 467 (2002); *see Tingey v. Haisch*, 159 Wn.2d 652, 658, 152 P.3d 1020 (2007) ("When a term has a well-accepted, ordinary meaning, a regular dictionary may be consulted to ascertain the term's definition."). The legislature recognized the need for comprehensive planning to effectively manage water resources:

> To ensure that available water supplies are managed to best meet both instream and offstream needs, a comprehensive planning process is essential. . . . Through a comprehensive planning process that includes the state, Indian tribes, local governments, and interested parties, it is possible to make better use of available water supplies and achieve better management of water resources. Through comprehensive planning, conflicts among water users and interests can be reduced or resolved.

RCW 90.54.010(1)(b).

-7-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The legislature also recognized that water does not respect human-made boundaries. It found that "[c]omprehensive water resource planning is best accomplished through a regional planning process sensitive to the unique characteristics and issues of each region." RCW 90.54.010(1)(c). The legislature entrusted the Department of Ecology with the task of developing and implementing the "comprehensive state water resources program." RCW 90.54.040(1). It also instructed local governments, including counties, to "whenever possible, carry out powers vested in them in manners which are consistent with the provisions of this chapter." RCW 90.54.090. In response to the WRA, the Department of Ecology established the Water Resources Management Program, *see* ch. 173-500 WAC, and water resource inventory areas, such as the "Nooksack Rule" at issue in this case, *see, e.g.*, ch. 173-501 WAC. *See also Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 81, 83, 11 P.3d 726 (2000).

I would interpret RCW 19.29.097 to align with the WRA. Allowing counties to integrate the Department of Ecology's water determinations into their comprehensive plans and rely on them when reviewing building permit applications promotes the integrated, comprehensive management the legislature envisioned. It also promotes consistent water management throughout a basin, recognizing that basins cross county lines.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In contrast, the majority's rule clashes with the WRA. The majority's holding will lead to county-by-county decisions on water use that directly undermine the WRA's mandate for a comprehensive water management plan. Not only that, but the majority's approach risks a race-to-the-bottom in water management. Counties, lacking both the Department of Ecology's expertise and its statewide perspective, are ill equipped to thoroughly vet the information that permit applicants will offer to show no impairment. Nor do county building departments have an obligation to perform their own research or consult with other potentially affected parties (e.g., tribes or other counties) before deciding whether a small well will negatively impact a senior water right. Of course, counties often *do* have an incentive to approve building permits, increasing the local tax base and boosting economic growth through new development. Requiring counties to make their own determination of whether water is *legally* available—rather than allowing them to rely on the Department of Ecology—undermines the comprehensive water management required by the WRA.[2]

---

[2] If the Department of Ecology determines that water is not legally available for permit-exempt withdrawals, it has the authority to close a basin to all future consumptive use, including permit-exempt wells. *See* WAC 173-501-070(2) (closing Whatcom Creek "to any further appropriation, including otherwise exempted single domestic use"). Under the rule I propose, counties could integrate the Department of Ecology's rules into their codes and rely on its closure of a basin to permit-exempt withdrawals to deny a building permit. Although the majority does not address this scenario, its holding suggests that

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Finally, the majority's interpretation is contradicted by the Department of Commerce's GMA development regulations and a formal attorney general opinion. The Department of Commerce regulations incorporate RCW 19.27.097's requirement that applicants for building permits provide evidence "of an adequate water supply for the intended use of the building." WAC 365-196-825(1). The regulations also state that cities and counties should consult 1992 Attorney General Opinion No. 17 (AG Opinion), which interprets RCW 19.27.097's requirements "for assistance in determining what substantive standards should be applied." WAC 365-196-825(2). Formal attorney general opinions "are generally 'entitled to great weight.'" *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 308, 268 P.3d 892 (2011) (quoting *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 803, 920 P.2d 581 (1996)).

The AG Opinion explains that "an 'adequate' water supply is one that is of sufficient quality and sufficient quantity to satisfy the demand created by the new building." 1992 Op. Att'y Gen. No. 17, at 7. Determining whether there is sufficient quantity depends on the source of the water: a public water system or another water source. *Id.* at 9-10. Moreover, this is solely a local determination. *Id.* ("[L]ocal

counties could *not* rely on the Department of Ecology's decision to close a basin, but would instead have to engage in an independent analysis to determine if a proposed permit-exempt withdrawal would, in fact, affect a senior water right before denying a building permit.

-10-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

building departments will be able to exercise greater discretion when determining whether other water sources provide water of sufficient quality and quantity" than they may exercise over public water systems). The AG Opinion explains that "any applicant for a building permit who claims that the building's water will come from surface or ground waters of the state, other than from a public water system, must prove that he has a right to take such water." *Id.* at 10-11. In order to meet this burden, the applicant must either have a permit from the Department of Ecology or meet the requirements for a permit-exempt well.[3] *See id.* (discussing permitting requirements and exception). Nothing in the AG Opinion suggests a building permit applicant must hire experts or undertake litigation to demonstrate that a permit-exempt well will not impair any senior water right.

In a footnote, the AG Opinion explains that junior water rights—established either by permit or by beneficial use of a permit-exempt well—may at times be curtailed to ensure no impairment of senior water rights. *See id.* at 11 n.5. The AG Opinion states,

---

[3] To be eligible to utilize a permit-exempt well, the withdrawal of groundwater must be "for stock-watering purposes, or for the watering of a lawn or of a noncommercial garden not exceeding one-half acre in area, or for single or group domestic uses in an amount not exceeding five thousand gallons a day, or as provided in RCW 90.44.052 [Whitman County clustered residential developments pilot project], or for an industrial purpose in an amount not exceeding five thousand gallons a day." RCW 90.44.050.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> Although RCW 19.27.097 states that a water right permit from the Department of Ecology may be evidence of an adequate water supply, we believe that, because of the first-in-time doctrine, it may not be sufficient evidence in cases where water is not actually available for withdrawal. In areas experiencing drought severe enough to deprive those holding junior water rights of water, for example, a local building department could require evidence in addition to the water right that a sufficient quantity of water actually would be available for the building to be constructed.

*Id.*

This statement should not be misconstrued to suggest that an applicant must prove the legal availability of water before the local building department may grant a building permit. It does not impose a mandate on local departments. Rather, this passage in the AG Opinion describes a situation in which junior water rights have been curtailed, and cautions that mere reliance on a Department of Ecology permit may not be sufficient in such situations. But, the curtailment of junior water rights occurs only after competing water rights have been resolved in superior court. *See Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 225, 234, 858 P.2d 232 (1993), *aff'd in part and rev'd in part*, 128 Wn.2d 508, 910 P.2d 462 (1996). The AG Opinion therefore suggests that a local building department *could* require additional evidence of no impairment if there has already been a water rights determination and junior rights have been curtailed. This limited situation will not affect the majority of building permit applications.

-12-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

II.    *The Majority Misinterprets* Kittitas County v. Eastern Washington Growth
       Management Hearings Board *and* Postema v. Pollution Control Hearings
       Board

The majority relies on *Kittitas County* to reach its holding that RCW
19.27.097 requires applicants to show that water is legally available, and that the
county, not the Department of Ecology, must make the ultimate determination of
water availability.  *See* majority at 20 ("Through [RCW 19.27.097(1) and RCW
58.17.110(2)], the GMA requires counties to assure that water is both factually and
legally available.  *Kittitas County*, 172 Wn.2d at 179-80.").   The majority
misinterprets that decision.   In *Kittitas County* we invalidated Kittitas County's
subdivision regulations that allowed multiple, separately evaluated subdivision
applications for properties that are all part of the same development.  We held such
regulations "tacitly allow[] subdivision applicants to evade this court's rule in
*Campbell & Gwinn*."[4]  *Kittitas County*, 172 Wn.2d at 177 (citing *Department of
Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 43 P.3d 4 (2002)).  We held,

> Without a requirement that multiple subdivision applications of
> commonly owned property be considered together, the County cannot meet
> the statutory requirement that it assure appropriate provisions are made for
> potable water supplies.   Instead, nondisclosure of common ownership
> information allows subdivision applicants to submit that appropriate

---

[4] In *Campbell & Gwinn*, we held that "commonly owned developments are not
exempt [from water permitting requirements] and therefore must comply with the
established well permitting process if the total development uses more than 5,000 gallons
of water per day." *Kittitas County*, 172 Wn.2d at 177.

-13-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

provisions are made for potable water through exempt wells that are in fact inappropriate under *Campbell & Gwinn* when considered as part of a development, absent a permit. To interpret the County's role under RCW 58.17.110 to require the County to only assure water is physically underground effectively allows the County to condone the evasion of our state's water permitting laws.

*Id.* at 180.

The majority interprets this case to hold that the county must evaluate the factual and legal availability of water. Majority at 20-21. What *Kittitas County* in fact holds is that county regulations cannot circumvent the requirements for valid permits issued by the Department of Ecology; subdivision applicants required to obtain water permits must obtain valid permits. In *Kittitas County*, we assumed the validity of permit-exempt wells, without requiring a further showing of no water rights impairment. 172 Wn.2d at 180. Thus, our decision in *Kittitas County* does not support the majority's imposition of additional burdens on building permit applicants and local jurisdictions.

The majority also improperly relies on our holding in *Postema* to conclude that "[i]t would be incongruous to limit *Postema* to the holding that Ecology must consider the effect of groundwater appropriations on minimum flows when issuing permits but that [Whatcom] County does not need to consider these same impacts when issuing building permits." Majority at 32. There are two problems with this statement. First, it rests on the same faulty interpretation of RCW 19.27.097(1),

-14-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

discussed above. Second, it is not "incongruous" to limit *Postema*'s holding to the facts of that case. By transposing a rule adopted for permitted wells into the permit-exempt context, the majority ignores the distinction between these types of withdrawals. *See* majority at 32. This statutory-based distinction is discussed in greater detail below. While *Postema* requires the Department of Ecology to determine if a permitted withdrawal of groundwater would negatively impact instream flows, nothing in that decision, or in the GMA, shifts this burden onto counties when individuals rely on permit-exempt wells.[5]

III. *The Practical Effect of the Majority's Holding Is To Prevent New Construction That Relies on Permit-exempt Wells*

The majority's holding amounts to a policy decision that GMA counties should not issue building permits that rely on permit-exempt groundwater withdrawals. This is not a policy decision we are at liberty to make.

---

[5] The majority finds additional support for its position "that counties must consider minimum flows when issuing building permits, even for developments relying on permit-exempt wells" in *Fox v. Skagit County*, 193 Wn. App. 254, ___ P.3d ___ (2016) (Division One), *petition for review filed*, No. 93203-4 (Wash. June 7, 2016). Majority at 33. A petition for review is pending in *Fox*, and it offers no greater authority than the decision below, also from Division One of the Court of Appeals. *See id.* For the reasons explained above, I would reject Division One's view that a county must determine whether a permit-exempt well would infringe senior water rights before issuing a building permit. *See id.* at 271.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Determinations of water availability are complex and costly. We recognized in *Postema* that "[t]he interrelationship [between groundwater withdrawals and surface water] can be quite complex and effects are sometimes difficult or impossible to measure in the field. Also, pumping groundwater may not have a discernable effect on surface water until considerable time has passed, depending upon the conditions." 142 Wn.2d at 75-76.[6] The majority fails to acknowledge the astronomical task it assigns to individual applicants. This task is particularly difficult to justify in light of the smallness of permit-exempt withdrawals.[7]

---

[6] The majority relies on *Postema* for the proposition that the Department of Ecology's understanding the effects of groundwater withdrawals on surface water has changed over time. *See* majority at 10. The majority then states that because in *Postema* we held the Department of Ecology must take these impacts into consideration when issuing groundwater withdrawal permits, counties must also take these impacts into account when issuing building permits. *Id.* at 10-11. As explained above, *Postema* does not require counties to evaluate the legal availability of water when considering building permits relying on permit-exempt wells. Furthermore, just because the Department of Ecology's understanding of water has evolved does not mean that counties are required to reevaluate the science behind the Department of Ecology's basin rules. If a party wishes to challenge a basin rule because of "old" science, the party may do so under Washington's Administrative Procedure Act, chapter 34.05 RCW. A challenge to the county's comprehensive plan is not the appropriate procedure.

[7] Domestic use permit-exempt wells may not withdraw more than 5,000 gallons of water per day. RCW 90.44.050. That equates to 3.47 gallons per minute (gpm). For comparison, for houses constructed under the Department of Housing and Urban Development mortgage insurance relying on individual water systems, "[t]he system should be capable of delivering a flow of 5 gpm." 24 C.F.R. § 200.926d(f)(2)(i). The withdrawals at issue in *Postema* were 280 gpm, 142 Wn.2d at 101; 200 gpm, *id.* at 103; 3,500 gpm, *id.* at 108; 60 gpm, *id.* at 111; and 100 gpm, *id.* at 115.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

This is not to say that studying the effect of permit-exempt wells is unimportant, just that it is unlikely to be undertaken by individuals applying for a building permit. In a recent publication, the Department of Ecology explained what is needed to assess the cumulative effects of permit-exempt groundwater withdrawals. *See* ANN WESSEL, DEP'T OF ECOLOGY, DRAFT: MITIGATION OPTIONS FOR THE IMPACTS OF NEW PERMIT-EXEMPT GROUNDWATER WITHDRAWALS 7-9 (2015).[8] "To understand how exempt well consumptive water use translates into effects on streams at a local scale," one must consider multiple factors, including well density, hydrogeologic factors, distribution of wells and well depths within the subbasin, timing of withdrawals, difference in indoor and outdoor consumptive water use, and tangential hydrologic changes due to landscape changes. *Id.* at 9. "To evaluate the effects of groundwater withdrawals on particular streams, some type of groundwater model is typically needed. If only one groundwater withdrawal is being analyzed, a simple analytical program may suffice." *Id.* at 10. The cost of building these models can be quite high. In a recent Court of Appeals case, it was estimated that the cost of the "specific hydrogeological data and models [that] are needed for informed decisions about managing and allocating water use and

---

[8] This publication, number 15-11-017, is available at http://www.ecy.wa.gov/programs/wr/wrac/images/pdf/15-11-017-reviewdraft.pdf [https://perma.cc/SAM2-88WK].

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

protecting surface flows in the Johns Creek basin" would be approximately $300,000. *Squaxin Island Tribe v. Dep't of Ecology*, 177 Wn. App. 734, 738, 312 P.3d 766 (2013). Once funding was obtained, it would take "at least two years to perform the study and to make its results useable to decision-makers." *Id.*

Furthermore, to best determine the effect of any groundwater withdrawal, it is necessary to investigate the hydrogeology of *all* connected surface and groundwaters. In a draft report discussing the appropriate technical methods for assessing the effects of groundwater withdrawals on surface water, technical experts from the Department of Ecology stated that "water-withdrawal proposals are always best evaluated in the context of an entire watershed. Therefore, the Committee recommends that tools and capacity be developed for basin-scale analysis of water resources." DEP'T OF ECOLOGY, DRAFT: REPORT OF THE TECHNICAL ADVISORY COMMITTEE ON THE CAPTURE OF SURFACE WATER BY WELLS ES-7 (1998).[9] The committee found that "the area of investigation for capture analysis must be large enough that 100% of the capture for a well or group of wells can be accounted for; this may only extend to the nearest surface water, but more often extends out . . . to the boundaries of the groundwater basin and, sometimes, beyond into adjoining

---

[9] This publication, number WR-98-154, is available at https://fortress.wa.gov/ecy/publications/documents/98154.pdf [https://perma.cc/JS6H-S3DX].

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

basins." *Id.* at 33. The committee recognized that "[a]ppropriate analysis and data collection . . . requires extensive effort, particularly if, as is frequently the case, the capture analysis is done without the benefit of previously developed base information on a basin's hydrogeology." *Id.* Given the complex nature of groundwater and surface water interaction, the majority's conclusion that RCW 19.27.097 requires individual applicants to show no impairment will effectively halt local departments from granting building permits.

The majority's holding pushes a massive, and likely insurmountable, burden onto individuals applying for a building permit. This was not the legislature's intent when it enacted RCW 19.27.097.[10] The exemption for small withdrawals of

---

[10] *See* Richard L. Settle & Charles G. Gavigan, *The Growth Management Revolution in Washington: Past, Present, and Future*, 16 U. PUGET SOUND L. REV. 867, 881-96 (1993) (recounting full legislative history). Relevant here is that at the time the legislature enacted RCW 19.27.097, it considered eliminating permit-exempt wells. The original Engrossed Substitute House Bill 2929 included a provision that removed the exemption; required those who wanted to construct a previously permit-exempt well to provide the Department of Ecology with 60 days' notice; allowed the Department of Ecology to require those wishing to construct a formerly exempt well "to apply for a water right permit if the area within which the withdrawal would occur is known or believed to have problems related to water availability, water quality, interference with existing water rights, or other related problems which could be adversely affected by additional withdrawals of ground water"; and allowed the Department of Ecology to deny the permit "if water is not available, if the use is not a beneficial use, if the use would adversely affect existing water rights, if the use would threaten water quality or if the use would be inconsistent with a local comprehensive plan." ENGROSSED SUBSTITUTE H.B. 2929, at 54-55, 51st Leg., Reg. Sess. (Wash. 1990). The senate amended the bill, removing these provisions. S. AMEND. ENGROSSED SUBSTITUTE H.B. 2929, 51st Leg., Reg. Sess. (Wash. 1990). After significant debate, *see*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

groundwater has "two evident and interrelated purposes: (1) to save the appropriator of a very small withdrawal the trouble and expense of applying for a permit where the effect of the withdrawal would be very slight; (2) to save the state the trouble and expense of processing applications for small withdrawals with little impact on the total water available." 1997 Op. Att'y Gen. No. 6, at 6. Requiring individual building permit applicants to show that their small withdrawal of water will not impair senior rights undermines both of these goals.

A far more sensible approach is to recognize that RCW 19.27.097 requires applicants to show only that sufficient water is factually adequate to support the proposed building, and that it is permissible for the county's regulations to follow the Department of Ecology's Nooksack Rule. This holding is consistent with GMA regulations and with the WRA. *See* WAC 365-196-825(3) ("If the department of ecology has adopted rules on this subject [adequate potable water], or any part of it, local regulations should be consistent with those rules. Such rules may include instream flow rules . . . ."); RCW 90.54.040 (requiring the Department of Ecology to develop and implement a comprehensive water resources program). It is also consistent with *Kittitas County*, in which we stated that the Department of Ecology

---

Settle & Gavigan, *supra*, at 886-87, the bill that was ultimately signed by the governor did not contain these provisions. *See* LAWS OF 1990, 1st Ex. Sess., ch. 17.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"ought to assist counties in their land use planning to adequately protect water resources," and maintained its role as the administrator of water appropriations. *Kittitas County*, 172 Wn.2d at 180; *see also Almgren v. Dep't of Ecology*, No. 11-109c, 2014 WL 3700692, at \*7 (Wash. Pollution Control Hr'gs Bd. July 1, 2014) ("to make these decisions [concerning water availability in land use permitting], the local government relies on information and expertise from other agencies including from Ecology." (citing *Kittitas County*, 172 Wn.2d at 178)).

I would hold that the county's code is consistent with RCW 19.27.097 and properly incorporates the Department of Ecology's Nooksack Rule. Thus, the county complied with GMA requirements to protect water. Because the majority holds otherwise, I respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Whatcom County, Hirst (Eric), et al. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 91475-3
(Stephens, J. Dissenting)

Stephens, J.

Fairhurst, J.

Gordon McCloud, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

– 22 –